**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UCHECHUKWU EGBUJO,
*Plaintiff*,

v.                                                                No. 3:20-cv-1133 (JAM)

NUVANCE HEALTH, INC.,
*Defendant*.

**ORDER DENYING IN PART AND GRANTING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The plaintiff is a black Nigerian male who was a medical resident at a hospital in

Norwalk, Connecticut. He was fired from his residency after he was accused of sexual assault

and after a law firm investigation found the allegations were likely true. During the law firm's

investigation, the plaintiff's supervisor—who ultimately made the decision to fire the plaintiff—

commented on Nigeria's "misogynistic" and "chauvinistic" culture. A hospital appeals panel

later overturned the decision to fire the plaintiff and reinstated him to his residency.

The plaintiff filed this federal lawsuit claiming that he was fired because of his race, his

national origin, and his gender, as well as further claiming that he was the victim of continued

discrimination after his reinstatement. The defendant has moved for summary judgment

I conclude that the supervisor's comment about Nigerian misogyny and chauvinism is

enough to withstand summary judgment with respect to the plaintiff's claims that he was fired

for reasons of race, national origin, and gender discrimination. On the other hand, I conclude that

there is no genuine issue of fact to sustain the plaintiff's claims that he was subject to additional

discrimination after he was reinstated to his residency. Accordingly, I will deny in part and grant

in part the defendant's motion for summary judgment.

BACKGROUND

Dr. Uchechukwu Egbujo is a black male from Nigeria.[1] He began his internal medicine residency at Norwalk Hospital in June 2018.[2] Norwalk Hospital is operated by the defendant Nuvance Health, Inc. ("Nuvance").[3]

Around July 30, 2019, a black, female medical resident (who I will refer to as "the complainant") accused Dr. Egbujo of sexual harassing and assaulting her on at least three occasions.[4] Dr. Egbujo's supervisor—Dr. Eunice Kang—spoke with the complainant about her accusations.[5] On August 1, Nuvance hired a law firm, Jackson Lewis, to investigate the complainant's allegations.[6] Then, on August 2, Nuvance placed Dr. Egbujo on temporary paid administrative leave while the investigation was pending.[7] The investigation included interviews of the complainant, Dr. Egbujo, Dr. Kang, and others.[8]

On August 23, 2019, Jackson Lewis released its investigative report, concluding that "Dr. Egbujo more likely than not engaged in conduct of an unwelcome sexual nature toward [the complainant] on one or more occasions and that he made threatening statements to dissuade [the complainant] from reporting this conduct."[9] The report included the following passages of note. First, Dr. Kang mentioned to investigators "that Nigerian culture is typically misogynistic and chauvinistic – however she stated that she never would have guessed that Dr. Egbujo was capable of something like this."[10] Second, Dr. Matthew Colna, a Co-Chief Resident of Internal

---

[1] Doc. #67 at 3 (¶ 9); Doc. #86-1 at 3–4 (¶ 9).
[2] Doc. #67 at 2 (¶ 7); Doc. #86-1 at 3 (¶ 7).
[3] Doc. #67 at 1 (¶ 1); Doc. #86-1 at 1 (¶ 1).
[4] Doc. #67 at 3 (¶¶ 11, 13); Doc. #86-1 at 4–7 (¶¶ 11, 13).
[5] Doc. #67 at 3 (¶¶ 10, 13); Doc. #86-1 at 4 (¶ 10), 7 (¶ 13).
[6] Doc. #67 at 3 (¶ 14); Doc. #86-1 at 7 (¶ 14).
[7] Doc. #67 at 3–4 (¶ 15); Doc. #86-1 at 8 (¶ 15).
[8] Doc. #67 at 4 (¶ 17); Doc. #86-1 at 8–9 (¶ 17).
[9] Doc. #65-13 at 28 (Report); see Doc. #67 at 4–5 (¶ 19); Doc. #86-1 at 13–14 (¶ 19).
[10] Doc. #65-13 at 11–12.

Medicine, "speculated that Dr. Egbujo's inappropriate physical contact may be cultural and that he is unaware of it. [Dr. Colna] states that his perception of the Nigerian culture is to be aggressive, if you want something, try and go get it."[11] The report prefaced these remarks by stating that "[b]oth Dr. Colna and Dr. Kang believe that Dr. Egbujo has not fully assimilated to American culture yet."[12]

On August 27, 2019, Nuvance provided Dr. Egbujo with a summary of the report's findings and then fired him the next day.[13] Dr. Egbujo appealed his termination to a Graduate Medical Education Appeals Panel consisting of Nuvance physicians and residents chosen from departments other than Internal Medicine.[14] The Appeals Panel reviewed the report and requested that Jackson Lewis supplement it with answers to 13 additional questions.[15] Jackson Lewis responded with a supplemental report on October 3.[16]

On October 10, 2019, the Appeals Panel rejected the report's conclusion that Dr. Egbujo violated Nuvance employee policy.[17] Dr. Egbujo was reinstated as a resident the same day.[18]

After his reinstatement, Dr. Egbujo was assigned to one of the busiest teams in the hospital, and Dr. Colna and another doctor told Dr. Egbujo that he would have to cover for the shifts that other residents had covered on his behalf while he was terminated.[19] Other residents

---

[11] *Id.* at 11; *see also* Doc. #1 at 5 (¶ 21) (Dr. Colna's full name and title).
[12] Doc. #65-13 at 11.
[13] Doc. #67 at 5 (¶¶ 21–22); Doc. #86-1 at 15–16 (¶¶ 21–22).
[14] Doc. #67 at 6 (¶¶ 24–25); Doc. #86-1 at 18–19 (¶¶ 24–25).
[15] Doc. #67 at 6 (¶ 26); Doc. #86-1 at 19 (¶ 26); *see* Doc. #65-3 (Appeal Panel request for supplementation).
[16] Doc. #67 at 6 (¶ 27); Doc. #86-1 at 19 (¶ 27); *see* Doc. #65-4 (Jackson Lewis response).
[17] Doc. #65-5 at 3.
[18] Doc. #67 at 6 (¶¶ 29–30); Doc. #86-1 at 20–21 (¶¶ 29–30).
[19] Doc. #65-6 at 6, 12; Doc. #86-1 at 21 (¶ 30). In Dr. Egbujo's statement of material fact, he states that "[w]hen he returned to the hospital, Dr. Egbujo was given a disproportionate amount of work, as the Defendant placed him on one of the busiest teams at the hospital without another resident to assist him, thereby effectively doubling his workload." Doc. #86-1 at 21 (¶ 30). Dr. Egbujo cites pages 20, 49, and 50 of his own deposition for this assertion. *Ibid.* (¶ 30). Although pages 20 and 49 describe how he was assigned to one of the busiest teams in the hospital and had to "pay back" the residents that covered his shifts while he was terminated, page 50 of Dr. Egbujo's deposition is missing from the record, and the record does not otherwise support Dr. Egbujo's contention that that his workload was effectively doubled. *See generally* Doc. #65 (Nuvance's exhibits in support of summary judgment); Doc. #95

treated him coldly upon his reinstatement.[20] In addition, a hospital social worker lodged a

complaint against him after his reinstatement alleging that Dr. Egbujo had engaged in

inappropriate work behavior.[21]

Dr. Egbujo graduated a few days after his peers.[22] He was rejected from all ten

gastroenterology fellowships to which he applied.[23]

In August 2020, Dr. Egbujo filed this lawsuit alleging that Nuvance discriminated against

him on the basis of race, national origin, and gender.[24] Counts One, Two, and Three of the

complaint allege that Nuvance violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.*, by discriminating against Dr. Egbujo on the basis of race, national origin,

and gender.[25] Count Four alleges that Nuvance violated Title IX of the Education Amendments

of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, by discriminating against Dr. Egbujo on the basis

of gender.[26] Counts Five, Six, and Seven allege that Nuvance violated the Connecticut Fair

Employment Practices Act, ("CFEPA"), Conn. Gen. Stat. § 46a–58 *et seq.*, by discriminating

against Dr. Egbujo on the basis of race, national origin, and gender.[27] Nuvance has moved for

summary judgment on all seven counts.[28]

---

(Dr. Egbujo's exhibits in opposition to summary judgment). Dr. Egbujo further states that "[d]efendant also ordered Dr. Egbujo to cover shifts that were not his responsibility, often calling on him first whenever a shift needed coverage." Doc. #86-1 at 21 (¶ 30). Dr. Egbujo cites page 60 of his own deposition for this assertion. *Ibid.* But page 60 does not appear in the record and nothing else in the record otherwise supports this contention.

[20] Doc. #65-6 at 6–7. Dr. Egbujo notes in his statement of material fact that "[t]he wrongful dismissal (and the wrongful breach of confidentiality) also alienated other workers from Dr. Egbujo, some of whom requested different work assignments because they said that they felt 'uncomfortable' around him." Doc. #86-1 at 23 (¶ 33). Dr. Egbujo cites pages 24 through 28 and 32 through 34 from Dr. Marina Beltrami Moreira's deposition and pages 23 and 30 from Dr. Nikita Jaggernauth's deposition to support this assertion.

[21] Doc. #65-6 at 7; Doc. #86-1 at 21–23 (¶¶ 32–33).

[22] Doc. #65-6 at 19–20; Doc. #86-1 at 23, 25.

[23] Doc. #65-6 at 34; Dox #86-1 at 24–25 (¶ 38), 27–28 (¶ 48).

[24] Doc. #1.

[25] *Id.* at 7–8 (¶¶ 36–44).

[26] *Id.* at 8 (¶¶ 45–48).

[27] *Id.* at 8–9 (¶¶ 49–57).

[28] Doc. #65.

### DISCUSSION

The principles governing review of a motion for summary judgment are well established.

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P.

56(a). I must view the facts in the light most favorable to the party who opposes the motion for

summary judgment and then decide if those facts would be enough—if eventually proved at

trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at

summary judgment is not to judge the credibility of witnesses or to resolve close contested issues

of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See*

*generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*).[29]

#### Title VII - Counts One, Two, and Three

Title VII prohibits employers from "discriminat[ing] against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). One form

of illegal discrimination that Title VII prohibits is intentional discrimination, also known as

disparate treatment, which occurs when "an employer has treated a particular person less

favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

As the Supreme Court has explained, "liability in a disparate-treatment case depends on

whether the protected trait actually motivated the employer's decision." *Young v. United Parcel*

*Serv., Inc.*, 575 U.S. 206, 212 (2015). "[A] plaintiff can prove disparate treatment either (1) by

direct evidence that a workplace policy, practice, or decision relies expressly on a protected

---

[29] Unless otherwise indicated, this order omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*

[*Corp. v. Green*, 411 U.S. 792 (1973)].” *Id.* at 213.

Here, I consider whether there is direct evidence that Dr. Egbujo’s protected traits

motivated the termination of his residency. Direct evidence of discriminatory treatment “need

not be the ‘proverbial smoking gun, i.e., an unequivocal statement by an employer that an

employee is being terminated for an impermissible reason.’” *Tenecora v. Ba-Kal Rest. Corp.*,

2021 WL 424364, at *3 (E.D.N.Y. 2021) (quoting *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762,

768 (S.D.N.Y. 2002)). “Rather, direct evidence is evidence ‘directly *reflecting* the alleged

discriminatory attitude.’” *Ibid.* (quoting *Ames*, 193 F. Supp. 2d at 768). “It can take the form of

‘a workplace policy, practice or decision [that] relies expressly on a protected characteristic’ or

‘conduct or statements by persons involved in the decisionmaking process.’” *Ibid.* (quoting

*Young*, 575 U.S. at 207; *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997),

*abrogated on other grounds by Nat’l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); and

*Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).

As direct evidence of discrimination, Dr. Egbujo points to the two statements by Nuvance

employees included in the Jackson Lewis report.[30] The first is Dr. Kang’s statement to

investigators that “Nigerian culture is typically misogynistic and chauvinistic.” The second is Dr.

Colna’s “speculat[ion] that Dr. Egbujo’s inappropriate physical contact may be cultural and that

he is unaware of it. [Dr. Colna] states that his perception of the Nigerian culture is to be

aggressive, if you want something, try and go get it.” Nuvance counters that the statements were

“stray remarks” rather than direct evidence of discrimination, and that “stray remarks, even if

---

[30] *See* Doc. #86 at 33–35.

made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination." *Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019).[31]

To decide if a remark is probative of discrimination rather than a stray remark, "courts consider 'four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).'" *Johnson v. L'Oreal USA*, 2023 WL 2637456, at *4 (2d Cir. 2023) (quoting *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).

All four of these factors point toward Dr. Kang's remark being probative of race, national origin, and gender discrimination. First, viewing the facts in the light most favorable to Dr. Egbujo, Dr. Kang qualifies as a decisionmaker in Dr. Egbujo's firing. Although Dr. Egbujo confusingly denies at one point in his statement of material facts that "Dr. Kang was the one who terminated Dr. Egbujo's employment," he then states in the same paragraph that "Dr. Kang fired Dr. Egbujo."[32] In any event, the record contains an affidavit in which Dr. Kang states: "Based upon the findings and conclusions in the Report and in consultation with Nuvance Health's Human Resources and legal departments, I made the decision to dismiss Dr. Egbujo from the residency program and terminate his employment."[33] Accordingly, there is sufficient evidence to create at least a dispute of material fact regarding whether Dr. Kang was a decisionmaker in Nuvance's decision to fire Dr. Egbujo.

---

[31] *See* Doc. #100 at 8.

[32] Doc. #86-1 at 16 (¶ 22); *see also* Doc. #86 at 19 (memorandum in opposition to motion for summary judgment stating that "Defendant (via Dr. Kang) fired Dr. Egbujo"); Doc. #66 at 23 (Nuvance's memorandum in support of summary judgment stating in part that "it is undisputed that the decision to terminate Plaintiff's employment was made by Dr. Kang").

[33] Doc. #65-11 at 3 (¶ 13).

Second, Dr. Kang made the remark shortly before and in the context of the employment investigation that gave rise to Dr. Egbujo's firing. Although the Jackson Lewis report does not attribute a date to Dr. Kang's remark, the investigation began on August 1, and Jackson Lewis released the report on August 27. So Dr. Kang must have made her comment to investigators in the month before Dr. Egbujo's firing on August 28. Courts have found remarks made five weeks or more before an employment decision to be probative of discrimination. *See Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41 (2d Cir. 2012) ("less than six weeks"); *Van Brunt-Piehler v. Absolute Software, Inc.*, 504 F. Supp. 3d 175, 187–88 (W.D.N.Y. 2020) (two months). Accordingly, Dr. Kang's remark is sufficiently proximate in time to make it probative of discrimination.

Third, a reasonable juror could view the remark as discriminatory with respect to national origin, given that the remark disparaged Nigeria's culture as "misogynistic" and "chauvinistic." To be sure, Dr. Kang then stated that she never thought Dr. Egbujo was capable of sexually harassing and assaulting a woman, but the second half of her remarks does not necessarily cancel out the first half. A reasonable juror could view the remark, taken as a whole, to espouse anti-Nigerian cultural stereotypes, even if Dr. Kang subsequently expressed surprise that Dr. Egbujo fit the stereotype.

A reasonable juror could also view the remark as racially discriminatory. "[R]ace and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003). In particular, "[r]ace and national origin discrimination may present identical factual issues when a victim is born in a nation whose primary stock is one's own ethnic group … and thus in certain circumstances … national origin and race discrimination may overlap." *Ibid.*

For example, in *Oranika v. City of Chicago*, 2005 WL 2663562 (N.D. Ill. 2005), the district court concluded that a Nigerian plaintiff administratively exhausted his race and color discrimination claims before the Equal Employment Opportunity Commission, even though he had raised only a national origin discrimination claim with the agency. The court stated that "[t]he people of Nigeria appear to be overwhelmingly black," such that "an allegation of discrimination on the basis of being Nigerian strongly implies discrimination on the basis of color and race, as well." *Id.* at \*4; *see also* U.S. Census Bureau, *Race*, https://www.census.gov/quickfacts/fact/note/US/RHI625221 [https://perma.cc/47BJ-LUU2] (last accessed July 21, 2023) (classifying "Nigerian" as "Black or African American").

A reasonable juror could also view Dr. Kang's remark as discriminatory with respect to gender because of its reference to misogyny and chauvinism. These references necessarily rely on assumptions about male rather than female behavior.

I do not agree with Nuvance's claim that Dr. Egbujo conceded in his deposition testimony that Dr. Kang did not act on the basis of gender. Nuvance points to a passage of testimony when Dr. Egbujo was asked, "How do you reconcile the fact that Dr. Kang writes you this strong recommendation with, you know, your apparent belief that she harbors bias towards you as a Nigerian man," and he responded with "I don't want to speculate" and "I don't know."[34] This response does not concede that Dr. Kang did not take into account Dr. Egbujo's gender. And a jury could find that there were self-serving and litigation-minded reasons why Dr. Kang would write him a recommendation letter after his reinstatement even if at the time that she fired Dr. Egbujo she harbored concerns about his Nigerian-related misogyny and chauvinism.

---

[34] Doc. #65-6 at 41–42.

9

As to the last of the four factors, Dr. Kang's remark was made to investigators in the course of the investigation that led to Dr. Egbujo's termination. "Where a supervisor's remarks are related to the employment decision made, they are probative of discriminatory intent." *Sethi v. Narod*, 12 F. Supp. 3d 505, 542–43 (E.D.N.Y. 2014) (collecting cases). All four factors thus point toward Dr. Kang's remark being probative of race, national origin, and gender discrimination.

As to the remark by Dr. Colna, I reach a different conclusion with respect to its probative value than the remark by Dr. Kang. Most significantly, there is no evidence that Dr. Colna was one of the decisionmakers in Dr. Egbujo's firing. Dr. Egbujo contends that "various individuals made the decision to fire Dr. Egbujo," and that there is "thus an open question whether Dr. Colna was one of the decisionmakers."[35] But the evidence on which Dr. Egbujo relies—excerpts from Dr. Kang's deposition testimony—says nothing about Dr. Colna.[36] Without evidence that Dr. Colna played a role in deciding to fire Dr. Egbujo, Dr. Colna's statement about Nigerian culture is more accurately characterized as a stray remark, even if it reflected bias and was made close in time to the firing decision. *See, e.g.*, *Johnson*, *Dixon v. Int'l Fed'n of Accts.*, 416 F. App'x 107, 110 (2d Cir. 2011) ("Indeed, [plaintiff's] entire employment discrimination claim is predicated on an isolated derogatory remark made by Barrett, who played no role in [plaintiff's] termination. We have long held that stray comments of this variety do not create an inference of discrimination.").[37]

In any event, Dr. Kang's remark alone is enough to sustain Dr. Egbujo's Title VII claims against the motion for summary judgment. When remarks attributed to a plaintiff's supervisor

---

[35] Doc. #86 at 36 (citing Doc. #86-1 at 16 (¶ 22)).

[36] *See* Doc. #86-1 at 16 (¶ 22) (citing Doc. #95-3 at 1–9).

[37] My conclusion that Dr. Colna's remark is not enough of itself to support a discrimination claim does not constitute a determination that Dr. Colna's remark should not be admissible at trial.

are direct evidence of discriminatory animus, a plaintiff has "provided sufficiently direct evidence of discrimination to allow a jury to find that her demotion was motivated, at least in part, by a forbidden factor." *Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 162 (2d Cir. 2001).

To be sure, Dr. Kang attests that her decision to fire Dr. Egbujo "was not related to his gender, national origin, or race in any way, but instead was solely based on the investigation findings which demonstrated that he more likely than not had violated several of Nuvance Health policies and procedures."[38] She may be correct, but that is for a jury to decide. My obligation at this point is to review the record in the light most favorable to Dr. Egbujo. And here the record of direct evidence based on Dr. Kang's remark to the Jackson Lewis investigators is enough to create a jury question about whether Dr. Egbujo was fired because of his race, national origin, and gender.

Because there is enough direct evidence of discrimination to sustain Dr. Egbujo's Title VII termination claim, I need not consider whether Dr. Egbujo's claims would also withstand summary judgment under the *McDonnell-Douglas* burden-shifting framework. Accordingly, I will deny Nuvance's motion for summary judgment with respect to Dr. Egbujo's Title VII termination claims.

I reach a different conclusion with respect to Dr. Egbujo's claims that he continued to be subject to discrimination after he was reinstated. "Title VII prohibits an employer from taking an adverse employment action against an individual because of such individual's race, color, religion, sex, or national origin." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019). But none of Dr. Egbujo's allegations relating the period after his reinstatement—that (1) fellow

---

[38] Doc. #65-11 at 3–4 (¶ 13).

medical staff treated him coldly upon his reinstatement;[39] (2) he did not graduate on time;[40] (3)

he was given a more onerous workload upon his reinstatement;[41] (4) his application to Norwalk's

gastroenterology fellowship was rejected;[42] and (5) Dr. Kulaga, the Associate Designated

Institutional Official for Graduate Medical Education, criticized Egbujo after a social worker

lodged a different complaint against him after his reinstatement[43]—raise an inference of

discrimination.

Indeed, most of Dr. Egbujo's claims that arise after his reinstatement do not count as

adverse employment action. Cold treatment by his fellow medical staff does not qualify as

adverse action because the alleged treatment did not involve any action by Nuvance itself.

Similarly, not graduating on time does not count as adverse action. Dr. Egbujo graduated a few

days after his peers, but he does not explain how that delay adversely affected him.[44] For

example, Dr. Egbujo testified that the delay did not require him to forgo any vacation.[45]

Nor is there any evidence—direct or indirect—that any of the complained-of post-

reinstatement conduct was because of Dr. Egbujo's race, gender, or national origin. To the extent

the post-reinstatement conduct Dr. Egbujo complains of resulted from his termination, it may be

relevant to calculating damages. But downstream consequences of allegedly discriminatory

action are not themselves discriminatory action. That is, Dr. Egbujo is incorrect that "harmful

consequences flowing from an adverse employment action" themselves qualify as adverse

employment action. The sole case Dr. Egbujo cites, *Kessler v. Westchester Cnty. Dep't of Soc.

Servs.*, 461 F.3d 199 (2d Cir. 2006), concerned adverse action taken by the employer itself—

---

[39] *See* Doc. #86-1 at 8 (¶ 16), 23 (¶ 35).
[40] See *id.* at 23 (¶ 35), 25 (¶ 39).
[41] *See id.* at 21 (¶ 30).
[42] *See id.* at 24–25 (¶ 38).
[43] *See id.* at 21–22 (¶¶ 32–33); *see also* Doc. #65-11 at 4 (¶ 14) (Dr. Kulaga's title).
[44] *See* Doc. #65-6 at 19.
[45] *See ibid.*

there, reassigning the plaintiff from White Plains to Yonkers and reducing his job responsibilities. *See id*. at 209–10.

Dr. Egbujo does not explain, and nothing in the record reflects, how the post-reinstatement conduct itself constitutes evidence of discrimination. Specifically, Dr. Egbujo does not illustrate how his allegedly increased workload upon his reinstatement evidenced discrimination. Similarly, Dr. Egbujo provides no connection between his rejected application to Norwalk's gastroenterology fellowship and purported discrimination.

Finally, after a social worker complained that Dr. Egbujo acted inappropriately toward her, Dr. Kulaga confronted Dr. Egbujo.[46] According to Dr. Egbujo, the social worker's allegations were false, and Dr. Kulaga's criticism was "improperly directed at Dr. Egbujo rather than at his entire team."[47] But even if Dr. Egbujo is correct that the social worker's complaint was false, Dr. Egbujo does not explain how a staff member lodging a false complaint, and another staff member singling him out for criticism, reveals discriminatory animus on the part of the employer. Moreover, no adverse employment action resulted from the social worker's complaint or the meeting with Dr. Kulaga.[48]

In short, the fact that Dr. Egbujo experienced adversity after his return does not mean that this hardship was itself the product of new discriminatory treatment that is attributable to Nuvance. Dr. Egbujo's Title VII claims in this respect fall short under both the direct evidence and *McDonnell Douglas* standards. Accordingly, I will grant Nuvance's motion for summary judgment as to the Title VII claims concerning Dr. Egbujo's treatment after his reinstatement.

---

[46] *See* Doc. #86-1 at 21–22 (¶¶ 32–33).
[47] *Id.* at 22 (¶ 32).
[48] *See* Doc. #67 at 7 (¶ 35). Egbujo denies Nuvance's assertion that "Plaintiff did not face any adverse employment action following complaints from the social worker and meeting with Dr. Kulaga," but he cites no evidence for his denial. Doc. #86-1 at 23 (¶ 35).

***Title IX – Count Four***

Nuvance moves for summary judgment as to Dr. Egbujo's Title IX claim for the same reasons that it seeks summary judgment as to Dr. Egbujo's Title VII claims. Title IX provides that, with exceptions not applicable here, "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). When evaluating the issue of discriminatory intent, courts generally apply the same standards to Title IX claims as they apply to Title VII claims. *See Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022); *Menaker*, 935 F.3d at 31. Because I have already concluded that there is a genuine issue of fact to sustain the gender-based Title VII termination claim, I will deny Nuvance's motion for summary judgment as to the Title IX termination claim. But for the same reasons set forth above, I will grant Nuvance's motion for summary judgment as to the Title IX claim based on post-reinstatement discrimination.

***CFEPA – Counts Five, Six, and Seven***

Nuvance similarly moves for summary judgment as to Dr. Egbujo's CFEPA claims. Dr. Egbujo brings his CFEPA claims under both Conn. Gen. Stat. § 46a–58 and § 46a–60(b)(1).[49] Section 46a–58(a) generally prohibits depriving any person of their federal or state rights, privileges, or immunities on the basis of protected factors such as race, national origin, or sex. Section 46a–60(b)(1) more specifically prohibits employers from discharging an employee on the basis of race, national origin, or gender among other protected factors.

The analysis of discrimination claims under CFEPA is the same as under Title VII. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (citing *Craine v. Trinity Coll.*, 259

---

[49] Doc. #1 at 8–9 (¶¶ 49–57).

Conn. 625, 637 n.6 (2002)). Because I have already concluded that there is a genuine issue of fact to sustain the Title VII claims, I will deny Nuvance's motion for summary judgment as to the parallel CFEPA termination claims. But for the reasons set forth above, I will grant Nuvance's motion for summary judgment as to the CFEPA claims of post-reinstatement discrimination.

## CONCLUSION

For the reasons set forth above, the Court DENIES Nuvance's motion for summary judgment as to Dr. Egbujo's claims that he was terminated in violation of Title VII, Title IX, and CFEPA, but GRANTS Nuvance's motion for summary judgment as to Dr. Egbujo's claims of post-reinstatement discrimination.

It is so ordered.

Dated at New Haven this 10th day of August 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

15